1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                   AT TACOMA

10    AARON GARMAN,

11                          Plaintiff,            CASE NO.    C06-5557RBL-KLS

12          v.                                    REPORT AND
                                                  RECOMMENDATION
13    MICHAEL J. ASTRUE[1], Commissioner of       Noted for April 27, 2007
      Social Security,
14

15                          Defendant.

16

17          Plaintiff, Aaron Garman, has brought this matter for judicial review of the denial of his application

18    for supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned

19    Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as

20    authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties'

21    briefs and the remaining record, the undersigned submits the following Report and Recommendation for the

22    Honorable Ronald B. Leighton's review.

23                          FACTUAL AND PROCEDURAL HISTORY

24          Plaintiff currently is twenty-eight years old.[2] Tr. 59.  He has a general equivalency diploma and past

25

26    _____

27          [1]Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue, who recently became acting Commissioner
      of Social Security, hereby automatically is substituted for Joanne B. Barnhart.

28          [2]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access
      to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

1  work experience as a dishwasher, delivery driver and laborer. Tr. 106, 283.

2      On August 22, 2001, plaintiff filed an application for SSI benefits, alleging disability as of September

3  1, 1993, due to anxiety attacks and an inability focus resulting from an attention deficit hyperactivity

4  disorder ("ADHD"). Tr. 22, 59, 100-01, 208J.  His application was denied initially and on reconsideration.

5  Tr. 21, 59-61, 66.  A hearing was held before an administrative law judge ("ALJ") on September 11, 2003,

6  at which plaintiff, represented by counsel, appeared and testified, as did plaintiff's mother and a vocational

7  expert. Tr. 30-58.

8      On November 26, 2003, the ALJ issued a decision, determining plaintiff to be not disabled, because

9  he was capable of performing other work existing in significant numbers in the national economy. Tr. 21-29.

10  Plaintiff's request for review of that decision was denied by the Appeals Council on January 12, 2005. Tr. 4.

11  Plaintiff then sought review of the Commissioner's adverse decision in this Court.

12      On November 17, 2005, the undersigned issued a report and recommendation, recommending that

13  the Court reverse the ALJ's decision and remand the matter to the ALJ for the purposes of re-evaluating the

14  lay witness evidence in the record from plaintiff's mother, and to obtain additional vocational expert

15  testimony regarding the apparent conflict between the vocational expert's testimony and the definition of

16  kitchen helper contained in the Dictionary of Occupational Titles ("DOT"), which the Court adopted on

17  December 16, 2005. Tr. 209-229.  On January 19, 2006, the Appeals Council remanded this matter to the

18  same ALJ pursuant to the Court's order. Tr. 230-32.

19      On remand, a second hearing was held on May 29, 2006, before the same ALJ, at which plaintiff,

20  represented by counsel, again appeared and testified, as did plaintiff's mother and a different vocational

21  expert. Tr. 267-85.  On June 21, 2006, the ALJ issued a second decision, once more determining plaintiff to

22  be not disabled, finding specifically in relevant part:

23      (1)   at step one of the disability evaluation process,[3] plaintiff had not engaged in
            substantial gainful activity since his alleged onset date of disability;
24
      (2)   at step two, plaintiff had a "severe" impairment consisting of an anxiety disorder;
25
      (3)   at step three, none of plaintiff's impairments met or equaled the criteria of any of
26            those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

27

28      [3]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled.
      See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

REPORT AND RECOMMENDATION
Page - 2

1

2

       (4)      at step four, plaintiff had the residual functional capacity to perform simple routine tasks with limited contact with co-workers and the public, and had no past relevant work; and

3

4

       (5)      at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 208J-208T.

5

6

On September 1, 2006, the Appeals Council declined to assume jurisdiction of the case, explaining

its decision not to do so in relevant part as follows:

7

8

9

10

11

The Administrative Law Judge complied with the directions in the remand order in that he re-evaluated the lay witness testimony of the claimant's mother, giving sufficient rationale for the weight given to it.  The Administrative Law judge also obtained additional testimony from a vocational expert to clarify the apparent conflict between the previous testimony and the definition of the job of kitchen helper in the Dictionary of Occupational Titles.  In addition to doing this, the vocational expert also named another job existing in significant numbers in the national economy that the claimant could perform.

12

13

14

. . . The Administrative Law Judge considered the opinion of David J. Reynolds, Ph.D., regarding the claimant's limitations in light of the evidence of record including the total opinion evidence of record, appropriate supporting clinical findings, and the testimony at the hearing.  The Appeals Council is persuaded that the Administrative Law Judge's conclusion regarding the opinion evidence of record is supported by substantial evidence.

15

16

Tr. 208A; 20 C.F.R. § 416.1484.  Because the Appeals Council declined to assume jurisdiction, the ALJ's

decision became the Commissioner's final decision after sixty days. 20 C.F.R. § 416.1484.

17

18

On September 26, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's

19

decision. (Dkt. #1-#3).  Specifically, plaintiff argues that decision should be reversed and remanded for an

20

award of benefits or, in the alternative, for further administrative proceedings before a different ALJ, for the

following reasons:

21

22

       (a)     the ALJ erred in evaluating the opinion of Dr. Reynolds;

23

       (b)     the ALJ erred in assessing plaintiff's credibility;

24

       (c)     the ALJ erred in evaluating the lay witness evidence in the record;

25

       (d)     the ALJ erred in assessing plaintiff's residual functional capacity; and

26

       (e)     the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

27

For the reasons set forth below, however, the undersigned finds that the ALJ properly determined plaintiff

28

to be not disabled, and therefore recommends that the ALJ's decision be affirmed.

REPORT AND RECOMMENDATION
Page - 3

1                                                DISCUSSION

2          This Court must uphold the Commissioner's determination that plaintiff is not disabled if the

3   Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to

4   support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

5   such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson

6   v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

7   a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

8   1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

9   one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d

10  577, 579 (9th Cir. 1984).

11  I.        The ALJ's Analysis of Dr. Reynolds' Opinion

12         David J. Reynolds, Ph.D., saw plaintiff five times from mid-February through late April, 2005. Tr.

13  254-60.  In early May 2006, Dr. Reynolds provided a written evaluation of plaintiff to plaintiff's attorney.

14  Tr. 261-64.  Dr. Reynolds diagnosed plaintiff with a social anxiety disorder/social phobia, an attention

15  deficit hyperactivity disorder, combined type, and a global assessment of functioning ("GAF") score of 45,

16  both current and the highest in the past year. Tr. 263.  Dr. Reynolds found that his psychiatric difficulties

17  evolved "around a fairly serious social phobia," and that his "present condition" made him unemployable

18  because he could not "tolerate job situations with strangers long enough to desensitize." Tr. 264.  Dr.

19  Reynolds also opined that plaintiff's condition "likely would improve in twelve to eighteen month's time" if

20  he had "regularly weekly treatment," that his ADHD symptoms were "now not very limiting," and that he

21  had "no other present handicapping difficulties" at the present other than his social phobia. Id.

22         In addition to the above written evaluation, Dr. Reynolds completed a mental medical assessment

23  form as well, in which he checked boxes indicating he felt plaintiff had significant limitations in a number of

24  mental functional areas. Tr. 265-66.  Of particular note, Dr. Reynolds indicated on the form that plaintiff

25  would have noticeable difficulty (i.e., "distracted from job activity and unable to perform") for more than

26  twenty percent of the workday and workweek with respect to the following areas: accepting instructions;

27  responding appropriately to criticism from supervisors; and getting along with co-workers or peers. Id.  In

28  addition, Dr. Reynolds indicated that plaintiff would not be able to perform a designated task or function on

1    a "regular, reliable and sustained schedule" in regard to: completing a normal workday and workweek;

2    performing at a consistent pace; and interacting appropriately with the general public. Id.

3        The ALJ found Dr. Reynold's opinion to be not fully supported by the record, and thus did not give

4    it great weight, for the following reasons:

5        As an initial matter, Dr. Reynold [sic] saw the claimant for therapy only five times one
         year ago.  He did not see the claimant again until requested to do so by the claimant's
6        counsel.  More importantly, however, is that all of Dr. Reynold's [sic] opinions are
         based on the claimant's subjective complaints, of which there are credibility concerns.
7        Further, there are inconsistencies.  Objectively, the claimant performed without issue on
         the mental status examinations, and Dr. Reynold [sic] noted his above average
8        intelligence, and encouraged the claimant to apply for jobs and work.  On March 31,
         2006, Dr. Reynold [sic] noted that the claimant had received his GED, whereas in his
9        updated psychological evaluation, he stated the claimant had not done so.  Dr.
         Reynold's [sic] updated evaluation contains statements indicating that the claimant had
10       made vast improvement, including socializing, going to bars and parties, having a
         girlfriend, and attending a job interview; however, he later states that the claimant is
11       profoundly affected by a social phobia.  Finally, I note that Dr. Reynold [sic] assigned a
         GAF score of 45, indicative of severe symptoms, when his narrative report indicated that
12       he was more than capable of carrying out activities of daily living, had moved out of his
         parents house, and was engaging in markedly increased social interaction.  It appears
13       significantly inconsistent that Dr. Reynold [sic] assigned the GAF score of 45, the lowest
         found in the medical evidence of record, even though a year earlier he assessed the
14       claimant's score as 55, and had found improvement since then.  Because of the
         inconsistencies, reliance upon subjective reports, and the limited duration of his
15       treatment of the claimant, I do not assign great weight to Dr. Reynold's [sic] opinion.

16   Tr 208P-208Q.  Plaintiff argues these reasons for rejecting Dr. Reynolds' opinion lacked both substance and

17   legitimacy.  The undersigned disagrees.

18       The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

19   medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

20   record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

21   ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must

22   be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir.

23   1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

24   inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

25   "falls within this responsibility." Id. at 603.

26       In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

27   supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

28   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

REPORT AND RECOMMENDATION
Page - 5

1   thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence."

2   Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the

3   ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

4         The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

5   either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

6   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

7   legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

8   ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

9   F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain

10  why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

11  (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

12        In general, more weight is given to a treating physician's opinion than to the opinions of those who

13  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

14  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

15  "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

16  1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

17  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

18  opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may

19  constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-

20  31; Tonapetyan, 242 F.3d at 1149.

21        Plaintiff first takes issue with the ALJ's statement that Dr. Reynolds had only five visits with him

22  over a two-month period in early 2005, and then just one more time more than a year later at the request of

23  his attorney.  It is true, as plaintiff asserts, that in the Ninth Circuit, a treating relationship has been found

24  between physician and claimant on the basis of as few as two visits over a period of fourteen months. See

25  Ghokassian v. Shalala, 41 F.3d 1300, 1303 (9th Cir. 1994) (also finding significant that claimant saw no

26  other physicians during same period, that claimant requested to be treated by physician in question, who

27  also prescribed drugs for claimant, that claimant listed said physician as his treating physician, and that said

28  physician referred to claimant as his patient).  The undersigned finds, however, that the ALJ was not

1  questioning Dr. Reynolds' status as a treating medical source here.  Rather, the ALJ merely was taking into

2  account the fact that in comparison to the other medical evidence in the record, Dr. Reynolds saw plaintiff

3  only very recently for a very limited amount of time.

4         Indeed, plaintiff focuses entirely on Dr. Reynolds's opinion in arguing that it should be credited as

5  true by this Court, and ignores all of the other objective medical evidence in the record, which the Court

6  previously found the ALJ properly evaluated.  The most recent of that medical evidence is dated from late

7  October 2002, and presents findings that lie in stark contrast to those made by Dr. Reynolds.  For example,

8  the findings of all of the prior examining and non-examining medical sources indicated plaintiff was capable

9  of doing at least some type of work. See Tr. 161-66, 168-80, 183-90.  It is not surprising then that the ALJ

10  viewed the new evidence submitted evidence with some skepticism.  To have done otherwise effectively

11  would render the Court's prior ruling on the medical evidence in the record meaningless.  That is, plaintiff

12  should not be able to overcome the Court's earlier final adverse determination on a particular issue merely

13  by later obtaining a more favorable report on remand.

14         Plaintiff next takes issue with the ALJ's statement that Dr. Reynolds' opinion was based solely on

15  his subjective complaints.  A physician's opinion premised on a claimant's subjective complaints may be

16  discounted where the record supports the ALJ in discounting the claimant's credibility. See Tonapetyan,

17  242 F.3d at 1149.  Plaintiff argues, however, that Dr. Reynolds did not rely solely on his own complaints,

18  but reviewed the medical evidence contained in the record as well.  While apparently true (see Tr. 261), an

19  ALJ, as the ALJ in this case did, still may disregard the opinion of a physician "premised to a large extent

20  upon the claimant's own accounts of his symptoms and limitations," where those complaints have been

21  "properly discounted." Morgan, 169 F.3d at 601 (emphasis added) (citations omitted).

22         The ALJ also noted various inconsistencies in Dr. Reynolds' opinion, including, for example, the

23  fact that Dr. Reynolds had found plaintiff to have above average intelligence and that he encouraged him to

24  apply for jobs and work.  Although the undersigned agrees that having an above average intelligence is not

25  necessarily inconsistent with a diagnosis of anxiety disorder, the fact that Dr. Reynolds did encourage

26  plaintiff to seek employment at the very least indicates he felt him to be capable of working at some level.

27  In addition, to the extent there is any ambiguity, which the undersigned does not find here, in regard to Dr.

28  Reynolds' actual, but unstated, reasons for having encouraged plaintiff in the direction of finding work, such

ambiguity was solely for the ALJ to resolve. See Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642;

REPORT AND RECOMMENDATION
Page - 7

1 | Morgan, 169 F.3d at 601.

2 |     Plaintiff argues Dr. Reynolds' contradictory statements regarding whether or not plaintiff received

3 | his general equivalency diploma ("GED") was not a proper basis for rejecting his opinion.  Plaintiff asserts it

4 | is likely this contradiction was based on a review of earlier accurate reports that he had not yet received his

5 | GED, rather than on a belief that he did not have one at the time Dr. Reynolds issued his opinion.  It is

6 | equally plausible, however, that Dr. Reynolds was not clear on this basic fact, the knowledge of which one

7 | would think would affect his evaluation of plaintiff's mental functional capabilities.  Again, this merely is

8 | another potential ambiguity that falls under the ALJ's purview to resolve.  As such, the undersigned cannot

9 | say the ALJ erred in finding against plaintiff on this issue as well.

10 |     Plaintiff further argues the ALJ erred in discounting Dr. Reynolds' opinion because he found on the

11 | one hand that plaintiff had improved substantially in terms of socialization, and then subsequently opined, on

12 | the other hand, that he was profoundly and severely affected by a social phobia.  Plaintiff asserts that just

13 | because he was found to have improved in one functional area does not in itself devalue Dr. Reynolds'

14 | opinions regarding his remaining limitations.  As plaintiff himself has argued, however, his social phobia and

15 | social anxiety are his primary bases for asserting disability, and, indeed, the primary bases on which Dr.

16 | Reynolds founded his opinion regarding plaintiff's inability to work.  As such, this inconsistency goes to the

17 | heart of Dr. Reynolds' credibility and plaintiff's disability claim.

18 |     The undersigned, furthermore, agrees with the ALJ that Dr. Reynolds's specific findings in regard to

19 | plaintiff's apparent improvement in social functioning are seriously at odds with his later opinion that

20 | plaintiff is incapable of all work based on his diagnosed condition.  For example, Dr. Reynolds expressly

21 | noted as follows at the beginning of his written evaluation:

22 |     His girlfriend seems to have a positive influence on Mr. Garman.  Not only has he begun
to job hunt for the first time in at least a year, she is forcing him to socialize.  "She likes

23 | sports, likes to do things, so we go out all of the time . . . we go to bars, watch her
relatives play baseball, go to parties, go to other houses to see people . . . I'm always

24 | nervous but go and make it through."  This is a marked increase in social contact
compared to when I saw Mr. Garman a year ago.  Then, his social contact was limited

25 | to acquaintances only about twenty per cent of the time.  Now, I believe he is socializing
with people he does not know at least five times per week and this contact is for several

26 | hours or more.

27 | Tr. 261.  Plaintiff argues in so noting this part of Dr. Reynolds' evaluation, the ALJ improperly selectively

28 | focused on just one area of his ability to function.  Again, however, this is the primary basis for plaintiff's

1  claims of inability to work.  Without it, plaintiff essentially has no case.

2  Plaintiff also asserts that the above noted improvement does not mean he is yet able to handle the

3  more stressful tasks of applying for and maintaining employment.  Dr. Reynolds himself though noted that

4  plaintiff had improved sufficiently enough to begin looking for work.  In addition, plaintiff has claimed it is

5  his inability to handle the stress of being around new people and situations that is the main factor limiting his

6  ability to apply for and maintain employment.  Yet, as is clearly set forth above, per the above report,

7  plaintiff was socializing in a variety of situations with people he did not know "at least five times per week .

8  . . for several hours or more" each time. Tr. 261.  It is difficult to believe plaintiff is incapable of engaging

9  effectively with other people at work, while he apparently is able to do so in other contexts.

10  Lastly, plaintiff challenges the inconsistency the ALJ found in Dr. Reynolds' assessment of a GAF

11  score of 45 at the time of his opinion, despite the aforementioned improvement in social functioning, and a

12  GAF score of 55 with which he assessed plaintiff more than a year earlier. Tr. 260, 263.  Plaintiff asserts

13  this ten point difference may have been due to Dr. Reynolds' review of the medical evidence in the record

14  or a more detailed evaluation of plaintiff's symptoms.  In other words, plaintiff argues, the GAF scores Dr.

15  Reynolds gave merely reflected his contemporaneous opinions at the time of each evaluation, without any

16  explanation therefor, and, in such a situation, the ALJ was required to re-contact Dr. Reynolds for further

17  clarification.  The undersigned again disagrees.

18  An ALJ has the duty "to fully and fairly develop the record and assure that the claimant's interests

19  are considered." Tonapetyan, 242 F.3d at 1150 (citations omitted).  However, it is only where the record

20  contains "[a]mbiguous evidence" or the ALJ has found "the record is inadequate to allow for proper

21  evaluation of the evidence," that the ALJ's duty to "conduct an appropriate inquiry" is triggered. Id.

22  (citations omitted); see also Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (ALJ's duty to further

23  develop record triggered only when there is ambiguous evidence or record is inadequate to allow for proper

24  evaluation of evidence).

25  Here, the record as a whole was not ambiguous, and the ALJ had a sufficient basis to allow for the

26  proper evaluation of Dr. Reynolds' opinion.  As discussed above, Dr. Reynolds' opinion is in stark contrast

27  to all of the other objective medical evidence in the record, including the independent medical opinions of an

28  examining psychiatrist, an examining psychologist and two non-examining consulting psychologists, all of

REPORT AND RECOMMENDATION
Page - 9

1   whom indicated plaintiff was capable of working.  The Court previously found there to be no problem with

2   the ALJ's evaluation of that evidence, and the undersigned sees no reasons to rule otherwise now.  Further,

3   as noted by the ALJ, it is difficult, to say the least, to reconcile the ten-point decline in plaintiff's GAF

4   scores with his contemporaneous marked improvement in social functioning.  Also as pointed out by the

5   ALJ, that decline is highly suspect in light of Dr. Reynolds' finding that plaintiff could "certainly do all

6   activities of daily living," and plaintiff's unremarkable mental status examination. Tr. 262-63.

7   II.    The ALJ's Credibility Analysis

8           Questions of credibility are solely within the control of the ALJ.  Sample, 694 F.2d at 642.  The

9   Court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the

10  Court may not reverse a credibility determination where that determination is based on contradictory or

11  ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should

12  properly be discounted does not render the ALJ's determination invalid, as long as that determination is

13  supported by substantial evidence. Tonapetyan, 242 F.3d at 1148.

14          To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

15  disbelief."  Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible

16  and what evidence undermines the claimant's complaints."  Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir.

17  1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the

18  claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The evidence as a whole must

19  support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

20          In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

21  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

22  testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

23  also may consider a claimant's work record and observations of physicians and other third parties regarding

24  the nature, onset, duration, and frequency of symptoms. Id.

25           With respect to plaintiff's credibility, the ALJ found as follows:

26          After considering the evidence of record, I find that the claimant's medically
            determinable impairments could reasonably be expected to produce the alleged
27          symptoms, but that the claimant's statements concerning the intensity, duration and
            limiting effects of these symptoms are not entirely credible.  As regards the claimant's
28          credibility, I found him to be generally credible in the prior decision and continue to find
            him so; however there are some discrepancies which stand out in the record.  For

REPORT AND RECOMMENDATION
Page - 10

1    example, the claimant reported to Dr. Reynold [sic] that he lived with his girlfriend in a
2    trailer with the girlfriend's sister and her boyfriend, but at the hearing he stated that he
     was trying to move in with the girlfriend but was having difficulty doing so because of
3    finances.  Further, I note that the claimant has done some work in the past, has applied
     for several jobs and has even attended an interview, which does not bolster his credibility
4    regarding statements that he cannot work.  The claimant is not limited in many areas and
     is more than capable of caring for himself, driving, shopping and has increased his social
5    interactions a great deal.  Therefore, I do not find the claimant completely credible
     regarding his assertion that he is disabled from performing work.

6    Tr. 208R.  In light of both the ALJ's above reasons for discounting plaintiff's credibility, and the credibility

7    findings the ALJ provided in his prior opinion, which the Court previously affirmed, the undersigned finds

8    the ALJ's overall credibility determination to be valid.

9         As noted above, the Court in its prior ruling remanded this matter to the Commissioner solely for

10   the purposes of re-evaluating the lay witness evidence in the record from plaintiff's mother, and to obtain

11   additional vocational expert testimony regarding the conflict between the vocational expert's testimony and

12   the definition of kitchen helper contained in the DOT.  The Court also expressly found the ALJ's previous

13   credibility determination to have been proper.  See Tr. 220-223.  Here, plaintiff focuses solely on the ALJ's

14   current stated reasons for discounting his credibility, which shall be dealt with below.  As such, however,

15   plaintiff once more appears to have ignored the Court's prior ruling regarding his credibility.  Plaintiff has

16   put forth no reasons why that issue should be re-visited, nor does the undersigned find any.

17        The undersigned, furthermore, finds the ALJ in fact did provide additional valid reasons for finding

18   plaintiff again to be not fully credible.  For example, the ALJ noted plaintiff's testimony at the hearing that

19   he was trying to move in with his girlfriend to have been inconsistent with his report to Dr. Reynolds that he

20   already was living with her.  See Tr. 261, 283.  Plaintiff argues these statements were not inconsistent, but

21   merely reflected different ways of looking at his living situation.  Specifically, he asserts his testimony and

22   prior report to Dr. Reynolds shows he spent part of his time at his girlfriend's house and three or more days

23   per week at his parents house doing chores.  While the record does show plaintiff went to his parents house

24   "three times or more per week" to do chores, it does not give any indication that he actually lived at their

25   house when he was there.  See Tr. 262.  Contrary to plaintiff's assertion, the ALJ was not "confused"

26   regarding these statements, but merely found them inconsistent, as does the undersigned.

27        The undersigned agrees the mere fact that plaintiff applied for jobs and engaged in activities of daily

28   living not requiring significant social interaction, is not alone a sufficient basis for discounting his allegations

REPORT AND RECOMMENDATION
Page - 11

1   that his anxiety and social phobia prevented him from working.  Plaintiff, however, has claimed to be

2   disabled at least in part on an inability to focus due to ADHD as well.  Thus, to that extent, evidence in the

3   record indicating an ability on his part to actively pursue work and to engage in a significant range of

4   activities of daily living is a valid basis for discounting his credibility.  The ALJ, furthermore, did note that

5   plaintiff also had "increased his social interactions a great deal." Tr. 208R.  This improvement in plaintiff's

6   social functioning, as explained above, is inconsistent with his allegations that he suffers from debilitating

7   limitations in his ability to work with other, unfamiliar people in a work setting.  As such, the ALJ properly

8   relied on this reason for discounting plaintiff's credibility as well.

9   III.      The ALJ's Evaluation of the Lay Witness Evidence in the Record

10          Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

11  account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

12  each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

13  testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

14  1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting

15  lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for

16  dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those

17  reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may

18  "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

19          A.      Plaintiff's Mother

20          With respect to the testimony and written statements provided by plaintiff's mother, the ALJ found

21  as follows:

22          I have considered the claimant's mother's testimony as well as her written statement.
            However, by virtue of the relationship as the mother of the claimant, the witness cannot
23          be considered a disinterested third party witness whose testimony would not tend to be
            colored by affection for the claimant and a natural tendency to agree with the symptoms
24          and limitations the claimant alleges.  As would any parent, Mrs. [Patricia] Garman is
            obviously concerned about future prospects for her son; no parent wants to accept that
25          their child will be limited to menial tasks.  However, the witness' testimony that the
            claimant cannot work is not reflected by the fact that the claimant is actively looking for
26          work.  Further, the witness testified that he would not go to work and school because of
            his anxiety, but he has managed to receive his GED and did work at McDonald's for a
27          year, in addition to having worked other jobs.  Statements contained in Mrs. Garman's
            written statement have been contradicted by the claimant's behavior.  For example, she
28          indicated that he does not go out or participate in activities, when he has stated that he
            goes out more frequently now that he is living with his girlfriend.  The claimant is able to

REPORT AND RECOMMENDATION
Page - 12

1    fish for five hours, and is able to perform household chores, which indicate he can follow
directions; she herself admits he can follow directions if given in steps.  Accordingly,
2    while I have considered Mrs. Garman's testimony and written statements made in
support of finding disability, I do not find it to be persuasive on the issue of the
3    claimant's disability.

4    Tr. 208R.  The undersigned finds the ALJ properly discounted Mrs. Garman's statements and testimony.

5        Plaintiff argues the ALJ improperly discounted those statements and testimony on the basis that she

6    is his mother in light of the requirement that the testimony of a claimant's friends and family be considered

7    by the ALJ.  While it is true that descriptions by friends and family members in a position to observe a

8    claimant's symptoms and daily activities must be treated as competent evidence, it has been held that the

9    existence of a "close relationship," and the potential to be "influenced" by the "desire to help," can be

10    "germane" to the particular lay witness in question. Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987)

11    (citing 20 C.F.R. § 404.1513(e)(2)); Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).

12        Accordingly, in Greger the Ninth Circuit found the ALJ properly considered the close relationship

13    that existed between the claimant and his former girlfriend, and the possibility that she may have been

14    influenced by the desire to help him. 464 F.3d at 972.  It is difficult to argue that the relationship between a

15    parent and child is less close than that between a former boyfriend and girlfriend.  In this case, there is no

16    indication that plaintiff lacks that kind of close relationship with his mother.  Rather, the opposite appears to

17    be true, as plaintiff continued to do chores several times a week for, and, indeed, according to plaintiff,

18    continued to live with, his parents at least part time.  As such, the undersigned cannot say that this was an

19    improper basis upon which the ALJ could discount Mrs. Garman's testimony.

20        Plaintiff next argues the fact that he has applied for jobs and worked at McDonald's for a year, as

21    well as at other jobs, and managed to receive his GED, is not inconsistent with the testimony of his mother

22    that he would not go to school or work due to his anxiety.  While it is true that applying for jobs or actively

23    looking for work is not the same as getting and maintaining it, the fact that plaintiff was able to stay at his

24    McDonald's job for as long as he did indicates at least some ability to work.  In addition, that plaintiff was

25    able to obtain his GED is indicative of an ability to finish high school, had he chosen to do so.  Indeed, he

26    reported that the reason he did not graduate from high school was due to the fact that he skipped too many

27    classes, stating specifically that he "was a senior, seniors skip classes," and "just didn't want to be there,"

28    and not because he could not handle it. See Tr. 184, 262.

1    Plaintiff further argues that the ALJ's observation in 2006 that he was going out more frequently is
2    not relevant to the issue of his level of functioning when his mother testified in early September 2003. The
3    point, however, is that plaintiff has brought forth the testimony of his mother to support his allegations that
4    he is disabled and therefore cannot work. As such, it is well within the ALJ's authority, and, indeed, it is his
5    responsibility, to compare that testimony with the other evidence in the record on the issue of plaintiff's
6    functioning capabilities, even though such testimony and evidence may not be contemporaneous with each
7    other. Plaintiff has cited to no legal authority to the contrary. Plaintiff also makes much of the fact that the
8    ALJ did not question Mrs. Garman on this issue at the second, late May 2006 hearing. However, given the
9    clear inconsistency noted above, the ALJ was not required to do so.

10    Lastly, plaintiff argues the fact that he was able to participate in daily activities that did not require
11    the involvement of other people showed the ALJ's lack of understanding of anxiety disorders, but was not
12    germane to the testimony of his mother. Plaintiff, though, also has claimed an inability to focus due to
13    ADHD. In addition, plaintiff's mother testified that he had trouble following and taking directions and
14    finishing tasks. See, e.g. Tr. 48-52. The fact that other evidence shows plaintiff was able to fish for five
15    hours and perform household chores belies the testimony of his mother, and his own claim, that he cannot
16    function in these areas. To that extent, the ALJ gave a "germane" reason.

17        B.      The Other Lay Witness Evidence in the Record

18    Plaintiff argues the ALJ failed to mention the lay witness statement provided by his sister and the
19    observations of Theresa Kelso, M.S.W., and Maribeth Flood, A.R.N.P. See Tr. 124-28, 160, 193-99. It is
20    true that the ALJ did not expressly address this evidence in the decision currently before the Court. The
21    ALJ, however, did incorporate his summary and discussion of the evidence contained in his prior decision.
22    In addition, the undersigned finds the ALJ was not required to address this evidence in his second decision.
23    This is because, as noted by the Court in its previous ruling, plaintiff failed to properly raise the issue of the
24    ALJ's evaluation of the lay witness evidence provided by plaintiff's sister and Ms. Kelso in his appeal of the
25    Commissioner's first adverse disability decision. Plaintiff, furthermore, never raised the issue of the ALJ's
26    evaluation of the observations made by Ms. Flood in that appeal as well. Thus, for the same reasons set
27    forth above – namely the lack of any basis for re-visiting an issue already ruled upon by the Court – the
28    undersigned declines to find any error on the part of the ALJ here.

1    IV.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

2           If a disability determination "cannot be made on the basis of medical factors alone at step three of

3    the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

4    assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

5    claimant's residual functional capacity assessment is used at step four to determine whether he or she can do

6    his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It thus

7    is what the claimant "can still do despite his or her limitations." Id.

8           A claimant's residual functional capacity is the maximum amount of work the claimant is able to

9    perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

10   must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

11   limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

12   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

13   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

14   medical or other evidence." Id. at *7.

15          Here, the ALJ assessed plaintiff with the same residual functional capacity with which he assessed

16   him in his prior decision, namely, that he was capable of performing "simple routine tasks with limited

17   contact with co-workers and the public." Tr. 208M.  Plaintiff argues this assessment failed to include all of

18   the limitations identified by Dr. Reynolds.  As discussed above, however, the ALJ did not err in rejecting

19   Dr. Reynolds' opinion.  Accordingly, the ALJ was not required to include in his assessment of plaintiff's

20   residual functional capacity the limitations found by Dr. Reynolds.  As such, the Court's previous finding

21   that the ALJ properly assessed plaintiff's residual functional capacity stands.

22   V.     The ALJ's Step Five Analysis

23          If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

24   process the ALJ must show there are a significant number of jobs in the national economy the claimant is

25   able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R.§ 416.920(d), (e).  The ALJ

26   can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-

27   Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157,

28   1162 (9th Cir. 2000).

REPORT AND RECOMMENDATION
Page - 15

1    An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

2  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

3  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

4  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

5  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

6  the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

7  description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.

8  2001).

9    At the late May 2006 hearing, the ALJ posed a hypothetical question to the vocational expert that

10  included the same limitations as were contained in the ALJ's assessment of plaintiff's residual functional

11  capacity. Tr. 270-71.  In response to that hypothetical question the vocational expert testified that plaintiff

12  could do other jobs. Tr. 271-80.  In this decision, the ALJ found in relevant part as follows:

13    I asked the vocational expert whether jobs exist in the national economy for an
       individual with the claimant's age, education, work experience, and residual functional
14     capacity.  The vocational expert testified that given all of these factors the individual
       would be able to perform the requirements of the representative occupation of cleaner
15     (DOT listing 323.687-014) with 4,000 [jobs] in Washington and 140,000 [jobs] in the
       United States.

16
       Regarding the vocational testimony at the prior hearing, Dr. Stewart [the vocational
17     expert at the late May 2006 hearing] explained that the job provided in that testimony,
       dishwasher, fell under a broader definition in the DOT, that of "kitchen helper."  She
18     explained dishwashing is an unskilled position, as it requires a specific vocational
       preparation (SVP) level 2.  SVP is defined as the amount of lapsed time required by a
19     typical worker to learn the techniques, acquire the information, and develop the facility
       needed for average performance in a specific job; level 2 is defined as anything beyond
20     short demonstration up to and including one month (DOT App. C).  However, she
       agreed that the "kitchen helper" position carried a general educational development
21     (GED) level of 2-1-1; in other words, it required Level 2 reasoning development, Level
       1 math development and Level 1 language development.  Level 2 reasoning
22     development is defined as the ability to apply commonsense understanding to carry out
       detailed but uninvolved written or oral instructions, and to deal with problems involving
23     a few concrete variables in or from standardized situations.  In contrast, Level 1
       reasoning development is the ability to apply commonsense understanding to carry out
24     simple one-or two-step instructions, and to deal with standardized situations with
       occasional or no variables in or from these situations encountered on the job, (DOT
25     App. C).  Because of the claimant's limitation to simple, routine tasks, there was some
       question as to whether he could perform the dishwasher position due to its Level 2
26     reasoning development classification.  Dr. Stewart's testimony clarified the conflict of
       the previous vocational expert's testimony, by explaining that there are many tasks
27     involved under the title "kitchen helper," but that within that range of tasks there are
       jobs that qualify as simple routine work.

28
       However, I accept Dr. Stewart's testimony that all the jobs and tasks in the range of

REPORT AND RECOMMENDATION
Page - 16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> cleaner are classified as GED 1-1-1.  Dr. Stewart testified that "jobs don't get more simple" than the cleaner position.  Dr. Stewart testified that regarding the kitchen helper position, there are tasks contained in the definition which are more than simple and routine if the whole scope of tasks is examined; however, there are jobs within that title which comply with the simple, routine task definition.  She emphasized that the cleaner position she described was definitely compatible with the DOT, and that an individual of the claimant's age, education, work experience, and residual functional capacity could perform that work.
>
> Dr. Stewart testified that there is no public contact involved in the cleaner job, and almost no co-worker contact. . . .
>
> Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.  Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  He can perform work as a cleaner.

Tr. 208S-208T.

Plaintiff argues the ALJ should have found him disabled based on the vocational expert's testimony that the mental functional limitations found by Dr. Reynolds would preclude all work.  As discussed above, however, the ALJ did not err in discounting Dr. Reynolds's opinion, and thus was not required to include the limitations Dr. Reynolds found in either his assessment of plaintiff's residual functional capacity or in the hypothetical question posed to the vocational expert.  Plaintiff further argues that his problem is that he does not show up consistently for work, and that the vocational expert at the first hearing testified that no employer would tolerate more than a couple of days per month of absenteeism.  However, it appears that plaintiff did not raise these issues in his first appeal to this Court (see Tr. 224-228), nor does the evidence in the record as whole support adoption of those limitations.

Lastly, plaintiff argues that his extreme anxiety in attending job interviews precludes his ability to obtain work as well, again apparently based on the testimony of the vocational expert at the first hearing.  Once more, however, the undersigned notes that this issue was not raised in plaintiff's first appeal to this Court.  Plaintiff should not now be able to ignore the Court's prior ruling so as to get a second bite at the apple.  In any event, he again has failed to show that the substantial evidence in the record supports such a finding.  Indeed, as discussed above, it seems that most recently plaintiff even has begun to increase his job search activities, including being able to "go and make it through" a job interview.  See Tr. 261.  As such, because it appears the ALJ has resolved the prior conflict in the evidence regarding the kitchen helper job, and even found another job plaintiff could perform, neither finding of which plaintiff otherwise specifically

REPORT AND RECOMMENDATION
Page - 17

1   has challenged, the ALJ's step five analysis was proper.

2                                              CONCLUSION

3          Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was

4   not disabled, and should affirm the ALJ's decision.

5          Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

6   the parties shall have ten (10) days from service of this Report and Recommendation to file written

7   objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

8   objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

9   imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **April 27, 2007**,

10  as noted in the caption.

11         DATED this 5th day of April, 2007.

12

13

14                                                          Karen L. Strombom
                                                            United States Magistrate Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPORT AND RECOMMENDATION
Page - 18